IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,          )
                                   )
        v.                         )          1:19CR312-1
                                   )
JABRELL CRAIG SMITH,               )
                                   )
                Defendant.         )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Defendant Jabrell Craig Smith filed a Motion to Suppress, (Doc. 11), and the Government responded to the motion, (Doc. 17); Defendant filed a reply, (Doc. 21). On November 7, 2019, this court held a hearing on the motion to suppress. (See Minute Entry 11/07/2019 ("Min. Entry 11/07/2019").) The Government presented the testimony of Corporal James Buchanan, Detective Robert Mayo, and ATF Task Force Officer Terry Bryson. (Id.) The Defendant testified. (Id.) Following the hearing, this court issued findings of fact and requested additional briefing on a several issues. (See Doc. 31.) The Government and Defendant responded with supplemental briefs. (Docs. 33, 34.) For ease of reference, this court makes its final findings of fact here and includes those explained in the November 15, 2019 Order, (Doc.

31), as well as additional findings as explained herein.[1] This court concludes that Defendant's motion to suppress should be granted as to the marijuana found in Defendant's pocket. The motion to suppress will be denied as to the firearms and heroin found in the vehicle and the statements Defendant made at the time of his arrest.

## I. **FINDINGS OF FACT**

1.    Then-Detectives Buchanan and Mayo were on duty as part of the Greensboro Police Department's Street Crimes Unit ("SCU") on the night of May 29, 2017. They were in an unmarked silver Chevy Silverado police vehicle. Detective Mayo was driving, and Detective Buchanan was sitting in the passenger seat.

2.    Both detectives were in plain clothes, but Detective Mayo was wearing a ballistics vest with "POLICE" written across the front.

3.    All SCU officers patrol in unmarked police vehicles and in plain clothes.

4.    That night, the detectives were surveilling Lucky 7's Sports Bar but were not in the Lucky 7's parking lot.

5.    At around 2 a.m., an off-duty officer working at Lucky 7's alerted the SCUs that Vincent Legrande was at Lucky 7's.

---

[1] This court incorrectly referred to Detective "Tyson" and has therefore corrected that to Detective Bryson.

6.     Vincent Legrande was known to the SCUs. High Point SCU had alerted the Greensboro SCU that he was a person of interest to them due to his gang involvement and history of violence. The Greensboro SCUs knew he was a convicted felon. There were no warrants out for Legrande at that time.

7.     Legrande, Defendant Smith, and Ja'kirus Staton left Lucky 7's and got into a dark colored Chevy Malibu. Sergeant Flowers radioed the license plate number of the Chevy Malibu correctly as ELL7755.

8.     The Greensboro SCUs were looking for any reason to pull over the Chevy Malibu, in order to make contact with Legrande.

9.     Detectives Buchanan and Mayo did not observe Legrande, Defendant Smith, and Ja'kirus Staton leaving Lucky 7's but did observe the Chevy Malibu leave the Lucky 7's parking lot onto West Gate City Boulevard and head towards South Holden Road.

10.     Ja'kirus Staton was driving the Chevy Malibu and Defendant Smith was in the front right passenger seat. Legrande was sitting behind Defendant in the rear passenger seat.

11.     Detectives Buchanan and Mayo ended up directly behind the Chevy Malibu at a red light at the intersection of West Gate City Boulevard and South Holden Road. The Silverado was six to eight feet behind the Chevy Malibu. Although both detectives

were in plain clothes, Detective Mayo recalls that he did have his ballistic vest on which has "POLICE" in large print on front of the vest.

12.   There are two left-turn lanes on West Gate City Boulevard. Both the detectives and the Chevy Malibu were in the turn lane closest to the straight traffic lanes. There was a vehicle in front of the Chevy Malibu and a vehicle in the leftmost left-turn lane next to the Chevy Malibu.

13.   At this point, Staton said to Defendant and Legrande that the police were behind them at the intersection.

14.   The detectives sat behind the Chevy Malibu for almost a minute. Both detectives could see the Chevy Malibu's license plate clearly.

15.   When the light turned green, and the Silverado moved into the space the Chevy Malibu had been, the detectives detected a medium to strong odor of burnt marijuana, presumably from the air vents. Both detectives had their windows rolled up.

16.   Both detectives acknowledge that the odor could have come from either of the other two vehicles that had been in the vicinity. This court finds the officers were not able to identify the odor of marijuana as coming from the Chevy Malibu sufficiently to provide probable cause or reasonable suspicion of criminal activity in the Chevy Malibu.

17.  At this point, Detective Buchanan incorrectly radioed
the rest of the SCUs the license plate of the Chevy Malibu as
"Eagle Eagle Lincoln 7755," meaning the license plate number was
EEL7755. In reality, the Chevy Malibu's license plate number was
ELL7755. Detective Mayo was focused on driving and surveilling
and did not realize Detective Buchanan's mistake. None of the
other units who had heard the incorrect plate number corrected
Detective Buchanan. Detective Buchanan was advised that plate
number "EEL 7755" was not registered to a Chevy Malibu.
Detective Buchanan therefore suspected the Chevy Malibu was
operated with a fictitious license tag. Detective Buchanan
testified, and this court finds, based upon his experience, the
use of a fictitious license tag is relatively common. Based upon
the information provided, Detective Buchanan had a reasonable
suspicion the Chevy Malibu was operating with a fictitious
license tag in violation of North Carolina law.

18.  Detective Buchanan's mistake in radioing the incorrect
license tag number was an honest, reasonable mistake of fact.
The correct tag number and the mistaken information as conveyed
by radio are sufficiently similar to suggest an honest,
reasonable mistake, even taking into account what the other SCU
officers may have heard the broadcast. This court believes,
after hearing the testimony and observing the witness, that

Detective Buchanan's testimony was credible and sufficient to support this finding. Detective Buchanan was not aware of any other instances in which an SCU officer radioed an incorrect tag number; this does not appear to be a common mistake by the SCU. This court therefore finds Detective Buchanan held a mistaken, but reasonable, belief the Chevy Malibu was in violation of North Carolina traffic law by displaying what appeared to be a fictitious license tag.

19.  The detectives followed the Chevy Malibu on Holden road for about two miles, at which point the Chevy Malibu turned into the Kangaroo gas station at the corner of Holden and Vandalia.

20.  The detectives continued on Holden and pulled onto a side street, where they waited for several minutes until Sergeant Flowers gave the SCUs the order to move in on Legrande. Sergeant Flowers did not tell the SCUs why.

21.  Detectives Buchanan and Mayo were the first to pull into the parking lot of the Kangaroo gas station, followed shortly thereafter by Sergeant Flowers in an unmarked police SUV.

22.  Six or seven other units came to serve as back-up and to provide assistance.

23.   Detectives Mayo and Buchanan both had body-worn cameras, but Detective Mayo forgot to activate his that evening. Detective Buchanan activated his, as did Sergeant Flowers. The following time stamps come from videos and still shots captured by the body-worn cameras.

24.   This court has reviewed and considered both the testimony and the video from the body-worn cameras. According to the testimony, the video from the body-worn cameras fairly and accurately depicts the events recorded at the gas station. This court finds the officers' testimony credible. There are places where, given the speed within which the action took place as well as the different actions that were taking place virtually simultaneously, this court has, where necessary, made findings from the video, testimony, and still shots as indicated. In addition, this court is not fully persuaded the body-worn cameras were all perfectly synchronized in time. As a result, this court has used both the time stamps on the videos as well as the relative locations of law enforcement and relevant parties to determine these facts as further explained herein.

25.   As the detectives pulled the Silverado in behind the left half of the Chevy Malibu, at 06:04:52 Zulu time according to Detective Buchanan's video, they observed the back right

passenger door open and Legrande exit the Chevy Malibu. Legrande walked over to a nearby vehicle with two women inside.

26.   Detective Buchanan and other officers pulled in to the Kangaroo lot and exited their vehicles with an overwhelming show of force. Detective Buchanan exited his vehicle with his firearm drawn, ballistic vest on, and approached the Malibu from the rear driver's side.

27.   Sergeant Flowers, at 06:05:10 according to his body-camera video, pulled up in his unmarked SUV next to the Silverado. At this point, the Chevy Malibu was seized, because the Chevy Malibu could not have realistically left its parking spot. Although Detective Buchanan was not able to recall whether he had activated his blue lights, video from the body-worn cameras show that both vehicles had activated their blue lights. The Chevy Malibu was clearly neither able to leave nor free to move from the parking spot within which it was located.

28.   At this point, Defendant Smith and Staton were inside the gas station. Defendant had grabbed a package of Starburst and a package of chips. Staton and Defendant were in the register area during their encounter with the officers.

29.   Between 06:04:59 and 06:05:45, officers came out of various vehicles, some of whom were running toward Legrande and

yelling, "HANDS UP HANDS UP HANDS UP, PUT'EM UP PUT'EM UP PUT

EM'UP," at Legrande. Officers detained Legrande.

30.   At 06:05:05[2], Detective Buchanan used a flashlight to

determine that there were no other passengers left in the Chevy

Malibu. At this same time, he detected a faint odor of

marijuana. Detective Buchanan instructed other officers,

including Detective Mayo, to watch the store. Detective Buchanan

then told other officers to get in the store, that he would stay

with the car.

31.   Detective Buchanan continued to check the Chevy Malibu

by shining his flashlight in the vehicle.

32.   At 06:05:34, Detective Buchanan observed the tip of

the barrel of a handgun sticking out from under the back of the

front passenger's seat. Almost simultaneously, he announced "32

32." "32" is a shortened version of the 10 code, "1032," which

is the code for firearm or weapon. It is not clear which

officers, outside the Kangaroo, may have heard his announcement

of "32." The Government has requested that this court make an

additional finding that when Detective Buchanan saw the handgun

toward the right rear seat footwell while he was standing

---

[2] Unless otherwise explained, from this point forward the
video time stamp refers to the body-camera video worn by the
specific officer mentioned in connection with the time stamps.

outside the Malibu in the Kangaroo parking lot. (Doc. 33 at 1.)
This court agrees with that fact and finds that Detective
Buchanan, at the time he observed the handgun, was standing
outside the Malibu in the Kangaroo parking lot.

33.  At the moment he announced "32," this court finds
Detective Buchanan was aware of the following facts: A firearm
was under the front passenger seat, toward the right rear seat
footwell, with the barrel pointed to the back of the car. The
firearm was accessible to the rear seat, and specifically the
passenger in the rear seat. Vincent Legrande had been sitting in
that seat moments before and the firearm would have been located
at his feet when the SCUs entered the parking lot. Detective
Buchanan also knew Vincent Legrande was a convicted felon.

34.  This court finds Detective Buchanan had probable cause
to believe Vincent Legrande, a convicted felon, had committed a
criminal offense by unlawfully possessing a firearm in the Chevy
Malibu.

35.  Detective Mayo and Sergeant Flowers had already
entered the gas station to approach Defendant and Staton at the
time Detective Buchanan announced "32" in the parking lot.
Shortly after Detective Buchanan announced "32" in the parking
lot, officers can be seen walking Vincent Legrande across the
parking lot in handcuffs.

36. Sergeant Flowers did not testify at the suppression hearing. However, the video from his body camera was introduced as Government Exhibit 3. The video shows, and this court finds, that Detective Mayo and Sergeant Flowers entered the Kangaroo before Detective Buchanan announced "32."[3] Other than the fact Vincent Legrande was a known convicted felon and believed to be involved in violent crime, no facts were presented to suggest Detective Mayo and Sergeant Flowers were aware of anything other than a possible fictitious tag violation. Sergeant Flowers advised Defendant he was being detained because of a fictitious tag. Neither officer was aware of the identities of Staton and Defendant at that time. Detective Mayo and Sergeant Flowers were both wearing ballistic vests. Sergeant Flowers walked immediately to Defendant and announced that he was being detained. The sound on the video suggests Sergeant Flowers had pulled out his handcuffs; the video appears to corroborate this fact. This court finds Sergeant Flowers approached Defendant, announced to Defendant that he was being detained, and virtually simultaneously attempted to place Defendant in handcuffs.

---

[3] It does not appear Detective Mayo had his gun drawn as he entered the Kangaroo. This court is not able to determine whether Sergeant Flowers had his gun drawn at that time.

37.   When Sergeant Flowers and Detective Mayo initially

approached Defendant and Staton, Defendant was standing in front

of the cashier as if to pay for merchandise, ignoring the

activity in the parking lot. Staton was standing behind

Defendant in line. This court finds Defendant's conduct does not

suggest Defendant was detained at the time law enforcement

officers pulled in the parking lot and detained Legrande.

Instead, this court finds Defendant was attempting to

deceptively ignore the activity in the parking lot as if he had

nothing to do with that vehicle and was simply a patron unaware

of and unconcerned by the activity outside the store.[4]

Defendant's testimony as to his subjective belief he was

detained when officers entered the parking lot is not credible.

He continued to move around in the store and approach the

cashier.

38.   At 06:05:49, Sergeant Flowers told Defendant he was

being detained and attempted to place Defendant in handcuffs by

---

[4] Defendant acknowledged, during his testimony, that he went
into the Kangaroo and, although he had no money, he picked up
merchandise and walked to the counter as if to pay for the
merchandise. The officers were, of course, not aware of the fact
Defendant did not have any money. However, the fact Defendant
went to the counter with merchandise and no ability to pay
supports the finding from the known facts that Defendant's
conduct was intended to be deceptive, posing as a store patron
with no interest in the events unfolding in the parking lot.

initially grabbing Defendant by the right arm. When Sergeant

Flowers initially approached Defendant, the video shows Sergeant

Flowers was standing to Defendant's right as Defendant partially

faced the counter and the cashier. As Sergeant Flowers and

Defendant argued after Sergeant Flowers said he was being

detained, their bodies turned, with Defendant turned around from

the counter and standing more to Sergeant Flowers' right, or

roughly straight on. Sergeant Flowers continued to try to talk

to Defendant and place Defendant in handcuffs. At 06:06:10,

according to Sergeant Flowers' body-worn camera video, Detective

Buchanan approached Defendant from behind, physically took

control of Defendant, and placed Defendant in handcuffs.

39.   Detective Buchanan's body-worn camera video shows that

he entered the store at 06:05:46, and that at 06:05:47–48 he

announced a "1032." The video shows, and this court finds, that

by the time Defendant and Sergeant Flowers are visible, at

approximately 06:05:49 on Detective Buchanan's video, Defendant

has turned away from the counter and is standing slightly to

Flowers' right with his back to the camera. Detective Bryson's

body-worn camera video shows that he and Detective Buchanan

entered the store at 06:06:10. Detective Bryson appears to be

walking in the store directly in front of Detective Buchanan.

According to Bryson's body-worn camera video, at 06:06:12–13,

Buchanan announces the "1032." Bryson's camera appears to confirm that Sergeant Flowers had already announced to Defendant that he was detaining Defendant because Defendant was already turned away from the counter.

40.   This court finds, in spite of the fact that the video recording times seem somewhat out of sync and may suggest something different, that when Sergeant Flowers first approached Defendant and said he was detained while simultaneously attempting to place handcuffs on Defendant, Sergeant Flowers was not aware Detective Buchanan had discovered a firearm in the Chevy Malibu, nor was Sergeant Flowers aware of the identity of Defendant. Sergeant Flowers did not testify, and this court finds Sergeant Flowers did not have a reasonable belief, or even a suspicion, that Defendant was possibly armed or dangerous.

41.   Defendant told Sergeant Flowers that the car was not his, that it belonged to Staton.

42.   At 06:07:59, Detective Lowe discovered another firearm in the floorboard of the front right passenger seat of the Chevy Malibu. The Government has requested that this court find as a fact that at the time Detective Lowe saw another firearm "in the floorboard of the front passenger seat," he was standing outside the Malibu, and at that time no search had occurred. (Doc. 33 at 1-2.) Detective Lowe did not testify at the hearing. Detective

-14-

Bryson testified that Detective Lowe saw and showed Bryson an additional firearm in the front passenger floorboard. This court has reviewed the video from Detective Bryson. This court finds that it appears Detective Lowe shined a light in the front passenger window, the window appears to be open at that time, and Detective Bryson looked in the front. It appears Detective Bryson immediately thereafter opened the back door of the Malibu to retrieve the firearm located in the backseat. Detective Buchanan's body-worn camera video does not clearly establish how the search may have occurred in relation to discovery of the firearm in the front passenger area. This court finds that the firearm in the front seat was observed by Detective Lowe while standing outside the car, but this court is not able to determine at what point the search may have started in relation to the discovery of the firearm in the front passenger area.

43.  Defendant was detained for about 30 minutes outside of the Kangaroo gas station while the car was searched.

44.  Defendant was arrested upon the finding of heroin in the Chevy Malibu. Defendant made several statements about the weight of the heroin. The field test weight was 4.5 grams, but Defendant insisted that the plastic baggie weighed one gram.

45.  On the facts of this case, this court finds that when the officers pulled into the gas station, the Chevy Malibu

itself was blocked in and, as a result, it was seized. However, no one was in the car at the time law enforcement blocked the Chevy Malibu in the parking space and therefore no occupants were detained at that time.

46. This court finds Defendant was not detained while officers were in the parking lot even though the Chevy Malibu was blocked in and Legrande was taken into custody. This court finds the following facts and factors with respect to this decision. First, at least 7 to 8 police officers were present, and those officers demonstrated an overwhelming show of force in the parking lot. The officers were wearing ballistic vests, many had guns drawn at some point, at least two police vehicles had blue lights flashing, and Legrande was detained. However, these activities were taking place in the parking lot. Inside the store, Defendant was free to move about and no officers were present inside the store until Sergeant Flowers and Detective Mayo approached Defendant and Staton. Up to the time of the officers' approach to Defendant and Staton, Defendant was free to pretend to purchase merchandise, Defendant was free to interact with the cashier, and Defendant appeared to ignore the activity in the parking lot. This court finds that it was not clear to a reasonable person what the officers may have intended

beyond taking Legrande into custody until the time officers approached Defendant and Staton inside the store.

47.  Defendant was detained when Sergeant Flowers approached him at the counter in the store, advised Defendant he was detained, and attempted to place handcuffs on Defendant, all of which happened almost simultaneously. The officers were armed, Sergeant Flowers placed his hands on Defendant, Defendant's movement was restrained, the statements by Sergeant Flowers were threatening, and Defendant was treated as though he was suspected of illegal activity.

48.  At the time Defendant was detained, Sergeant Flowers' knowledge of criminal activity was limited to the fact Defendant had been associated with a car that may have had fictitious tags. However, this court also finds that, while Sergeant Flowers approached and attempted to detain Defendant, Detective Buchanan was in the parking lot, discovered the firearm in the floorboard of the backseat, and announced the discovery of the firearm to other law enforcement officers.

49.  Detective Buchanan entered the store, announced the "1032," and also advised Detective Mayo and Sergeant Flowers to detain Staton and Defendant by stating "26," which is code for "detain." At this point, Defendant was then further detained at the instruction of Detective Buchanan, who was aware of the

following information: he had a reasonable (although later shown to be incorrect) belief the Chevy Malibu had fictitious tags, he had smelled a mild odor of marijuana beside the car which was reasonably attributable to the car, and he had probable cause to believe moments before officers approached the car that Legrande, a convicted felon, was unlawfully in possession of a firearm in the backseat of the Chevy Malibu.

50. This court further finds that after Defendant was detained, Sergeant Flowers searched, rather than patted down, Defendant's clothing. Sergeant Flowers stated that he was looking for some identification. This court does not find, at that point, that Sergeant Flowers had any basis upon which to search the pockets of Defendant's clothing. The Government requests that this court clarify that Sergeant Flowers did not search Defendant's person until after Detective Buchanan announced "32" in the gas station and advised Sergeant Flowers that there was "a gun in the car and a convicted felon sitting right on top of it." (Doc. 33 at 2.) This court agrees with those facts and so finds. However, this court declines to find that Legrande's possession of a firearm somehow authorizes the pat down and detention with handcuffs of Staton and Defendant under a theory that they may be armed and dangerous. The Fourth Circuit has clearly rejected a theory suggesting that anyone in

proximity to an individual with a gun is involved in criminal activity. See United States v. Black, 707 F.3d 531, 541 (4th Cir. 2013).

## II.  ANALYSIS

The court will first address the seizure and search of the Malibu, then the seizure and search of Defendant.

### A.  The Seizure and Subsequent Search of the Malibu

The Malibu was seized[5] when officers entered the parking lot and pulled in behind the Malibu with blue lights flashing.

#### 1.  Officer's Reasonable Mistake of Fact

This court finds the seizure of the Malibu was based upon a mistaken, but reasonable, belief the tags were fictitious and the Malibu was operated in violation of North Carolina law.

> The Fourth Amendment prohibits "unreasonable searches and seizures." Under this standard, a search or seizure may be permissible even though the justification for the action includes a reasonable

_____

[5] This court may alternatively use "seized" and "detained" when referring to the Malibu during the time it was blocked in by law enforcement vehicles but not occupied. This court did not make a specific finding as to whether the car was running at the time of the seizure, as testified to by Defendant, because it was not clear from the evidence whether it was or was not running. However, if the car was running, that might be some evidence that at least the driver did not intend to remain on the premises of the Kangaroo for an extended period of time. Regardless, this court does not find, on these facts, that the length of time the occupants intended to remain in the Kangaroo changes the fact that at the time the Malibu was seized, officers may have, at most, intended to detain Defendant but had not done so.

> factual mistake. An officer might, for example, stop a
> motorist for traveling alone in a high-occupancy
> vehicle lane, only to discover upon approaching the
> car that two children are slumped over asleep in the
> back seat. The driver has not violated the law, but
> neither has the officer violated the Fourth Amendment.

Heien v. North Carolina, 574 U.S. 54, 57 (2014). Cases in the

Fourth Circuit recognize that an officer's reasonable mistake of

fact may provide objective grounds for reasonable suspicion or

probable cause required to justify a traffic stop. See United

States v. Mubdi, 691 F.3d 334 (4th Cir. 2012), vacated and

remanded on other grounds, 570 U.S. 913 (2013); United States v.

Arias, 213 F. App'x 230 (4th Cir. 2007) (unpublished).

In United States v. Walraven, 892 F.2d 972 (10th Cir.

1989), the Tenth Circuit affirmed a finding that an officer's

failure to correct the dispatcher when the dispatcher

incorrectly repeated license plate information constituted an

objectively reasonable mistake. The Tenth Circuit described the

circumstances:

> Based upon the circumstances as he perceived them,
> Debree had an "articulable and reasonable suspicion"
> that his stop of the Cadillac would reveal the
> existence of a crime. The court explicitly found that
> because Debree was concentrating on the Cadillac he
> did not hear the dispatcher incorrectly repeat the
> license plate information. Debree testified that he
> was concentrating on the road as well. Given Debree's
> testimony, the district court acted well within its
> authority in finding that Debree's failure to correct
> the dispatcher was objectively reasonable and not a
> pretext for his subsequent actions.

Id. at 975 (internal citations omitted). It is clear to this
court from the circumstances here that Buchanan's mistaken
communication of the license number was simply an honest,
reasonable mistake. Given the similarity of the actual tag to
the communicated tag in the double letters (EEL and ELL), the
fact that Buchanan was also at that same time observing the
driving and relaying other information to officers,[6] this court
does not find it unreasonable that a mistake occurred.
Furthermore, because a mistake of this type had not occurred
before, it does not appear this error in communicating the tag
information was a pretextual effort on the part of the officers.

Defendant argues that an Ohio district court opinion is
persuasive and supports a finding the mistake was not
reasonable. In United States v. Anderson, No. 4:07cr0023, 2007
WL 4732033, at *7–8 (N.D. Ohio June 21, 2007), that court held
that the Government's failure to communicate accurate
information was an unreasonable mistake. Notably in Anderson,
the district court found that "the government has failed to
present any evidence sufficient to show how or why the mistake
was made." Id. at *7. The court went on to find that "there is

_____

[6] These facts were testified to on redirect, and this court
finds these facts credible.

-21-

simply no evidence to persuade the Court that the mistake was reasonable in this case." Id.

In contrast, the officer who made the mistake in the present case testified. This court was able to hear testimony as to the mistake, observe the officer's testimony, evaluate the circumstances under which it was made, and the nature of the mistake itself. After considering all the evidence, this court is satisfied the mistake was an honest, reasonable mistake.

### 2. Prolonged Duration of Seizure

Defendant further argues that even if the initial mistake was reasonable, the seizure was artificially prolonged and, as a result, the seizure became unreasonable. (Doc. 34 at 2-3.) This court agrees with Defendant that "[t]he permissible duration of a traffic stop 'is determined by the seizure's mission – to address the traffic violation that warranted the stop.'" (Id. at 3 (quoting Rodriguez v. United States, 575 U.S. ____, ____, 135 S. Ct. 1609, 1614 (2015).) However, this court does not find the stop was artificially prolonged. No one was in the vehicle as officers seized the car, the plain view investigation initially started as a check to see if anyone remained in the car, and a firearm was observed in the rear passenger area before the driver was located.

There is no doubt the officers were primarily interested in Legrande, but the initial stop escalated quickly upon observation of the gun. This court does not find the initial traffic stop was artificially prolonged given the quick discovery of a firearm in the footwell of the seat recently occupied by a convicted felon.

### 3. <u>Defendant's Standing for Challenging Search and Seizure of the Vehicle</u>

<u>Rakas v. Illinois</u>, 439 U.S. 128, 148 (1979) requires that an individual must assert a property or possessory interest in the automobile to have standing to challenge the search of that automobile. Defendant has not asserted a property or possessory interest in the automobile and, accordingly, does not have standing to challenge the search of the automobile under <u>Rakas</u>.

Further, "[a] passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object." <u>United States v. Carter</u>, 300 F.3d 415, 421 (4th Cir. 2002). However, Defendant argues under <u>Brendlin v. California</u>, 551 U.S. 249 (2007) that, as a passenger in the vehicle, he was seized when officers

seized the Malibu even though Defendant was outside the vehicle. (Doc. 34 at 3.)

Brendlin recognized that a passenger in an automobile was seized during a traffic stop. See 551 U.S. at 257 ("A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver . . . and the police activity that normally amounts to intrusion on 'privacy and personal security' does not normally . . . distinguish between passenger and driver." (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976))). Brendlin does provide a passenger with standing to challenge his seizure during a traffic stop and, as a result, may under some circumstances allow a passenger to challenge evidence obtained if seized as the fruit of an unlawful seizure of the passenger. However, because Defendant was outside of the Malibu and inside a store at the time of the initial seizure of the Malibu, Brendlin's holding that a passenger is seized at the time of a traffic stop is not applicable to the Defendant in this case.

This court instead finds the Fourth Circuit's analysis in United States v. Allison, 398 F. App'x 862 (4th Cir. 2010) (unpublished) persuasive. In Allison, a Fourth Circuit panel distinguished Brendlin, which involved a passenger in a stopped car, from a pedestrian who has just stepped out of a car:

Indeed, _Brendlin,_ the very case on which Allison relies to claim standing as a passenger, draws a stark contrast between individuals within a vehicle and those outside its confines: pedestrians possess a degree of physical and environmental freedom that automotive occupants lack. The holding in _Brendlin_ – that a traffic stop seizes a passenger as well as the driver — rests on the physical confinement of the automobile. . . .

Here, by contrast, confinement _in the Explorer_ did not limit Allison's freedom of movement at the time the officers pulled into the driveway and blocked the vehicle. Police effect a seizure only if they "terminate[] or restrain[] [an individual's] freedom of movement" "by means of physical force or show of authority." Because the car did not limit Allison's movement at the time of the police encounter, the blocking of that car did not restrain his freedom of movement.

_Id._ at 864 (internal citations omitted) (quoting _Brendlin,_ 551 U.S. at 254, 257). The court in _Allison_ held that Allison did not have standing to contest the search of the vehicle, nor was the search the fruit of an illegal seizure of Allison. _Id._ at 864–65.

This court similarly finds that Defendant, as a pedestrian at the time of the seizure of the Malibu, was not seized at the same time as the Malibu. Even if Defendant may have intended to return to the vehicle in the near future, Defendant was outside the Malibu at the time of the seizure of the Malibu as a result of the belief the tags were fictitious. Defendant therefore does

not have standing to challenge the initial seizure of the Malibu because he was not seized at the same moment as the Malibu.

Even assuming Defendant does have standing to challenge the initial seizure of the Malibu, either under a passenger theory or as a pedestrian, this court finds the initial seizure of the Malibu was proper based upon at least a reasonable suspicion the vehicle was operating with fictitious tags.

> [W]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment. Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity."

United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) (quoting United States v. Cummins, 902 F.2d 498, 499-501 (8th Cir. 1990)). This is an objective test. Id.

In this case, Buchanan held a reasonable belief the vehicle had committed a violation of N.C. Gen. Stat. § 20-111(2) ("It shall be unlawful for any person . . . [t]o display or cause or permit to be displayed . . . any registration number plate knowing the same to be fictitious . . . ."). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). The

officers thus had at least reasonable suspicion to seize the Malibu, even if Defendant had standing.[7]

Finding the seizure of the Malibu lawful, the court turns to the search of the Malibu.

### 4. <u>Search of Vehicle</u>

This court finds that the search of the Malibu was supported by probable cause. With respect to Defendant's challenge to that search, this court finds, regardless of whether Defendant has standing to challenge the search, that the subsequent search of the Malibu was supported by probable cause, and the heroin and firearms found within are admissible.

Immediately following the seizure of the Malibu, Buchanan approached the car to check for possible occupants. While

---

[7] It is clear, however, by the officers' conduct after seizing the Malibu that their suspicions far exceeded a simple traffic stop for a fictitious tag. Multiple officers in tactical gear with guns drawn used overwhelming force to seize the Malibu and detain Legrande immediately. However, the propriety of Legrande and Staton's detention is not at issue in this case. Even if the subjective intentions of the officers far exceeded that of a garden-variety traffic stop for fictitious tags, the officers' subjective intentions are not material. <u>See</u> <u>Hassan El</u>, 5 F.3d at 730; <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) ("[T]hese cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Thus, the officers' subjective intentions do not change the outcome. The seizure of the Malibu was supported by reasonable suspicion.

standing beside the car, he smelled the faint odor of marijuana in the area of the Malibu; however, he was not able to localize the smell of marijuana. Nevertheless, in the absence of any other possible source of the odor, it was reasonable for Buchanan to continue to use his flashlight to look into the car in search of anything that might confirm the presence or source of the faint odor of marijuana while other officers approached the driver and passenger in the Kangaroo. Nor did Buchanan unreasonably prolong the stop by doing so, as everything happened quickly, and the recent occupants of the Malibu were inside the Kangaroo. Buchanan then saw, in plain view, the firearm in the backseat of the Malibu in the back-passenger area and in a position accessible to an individual known to be a convicted felon.

The relatively short process between the initial seizure of the Malibu and discovery of a firearm did not unreasonably prolong the stop in light of the totality of circumstances. Specifically, immediately following the seizure of the Malibu, Buchanan initially checked the Malibu for occupants and, finding none, continued looking in the car by shining his flashlight in the car. As Defendant concedes, an officer does not conduct a search within the meaning of the Fourth Amendment by looking inside a vehicle with a flashlight. Texas v. Brown, 460 U.S.

730, 739-40 (1983) ("It is likewise beyond dispute that Maples'
action in shining his flashlight to illuminate the interior of
Brown's car trenched upon no right secured to the latter by the
Fourth Amendment."); United States v. Smith, 456 F. App'x 200,
208 (4th Cir. 2011) (The agent did not search the tractor
trailer by standing outside of it and pointing his flashlight in
the open gap to see liquor jugs inside the tractor trailer.).
Once Buchanan saw the firearm located on the floor in the rear
passenger area where a known felon had just been sitting, he had
probable cause to believe a crime had been committed. All of
this occurred at approximately the same time as officers
approached both the driver, Staton, and Defendant inside the
Kangaroo.

While the presence of a firearm alone might not provide
facts to make the incriminating character of the firearm
immediately apparent, Buchanan was also aware that Legrande was
a convicted felon and had been seated in the backseat moments
before. Those facts provided probable cause to believe Legrande,
a convicted felon, was at least in constructive possession of
the firearm and had likely had actual possession of that firearm
previously. Buchanan therefore had probable cause to believe the
firearm was evidence of a crime. See Arizona v. Hicks, 480 U.S.
321, 326 (1987); United States v. Johnson, 107 F. App'x 322, 328

(4th Cir. 2004). As a result, Buchanan was constitutionally permitted to conduct a warrantless search of the car, at least sufficient to seize the firearm. <u>Carroll v. United States</u>, 267 U.S. 132 (1925).

Although not specifically challenged, this court has considered the permissible scope of the search of the vehicle after discovery of the firearm at the feet of where Legrande had been sitting. As Bryson prepared to open the back door of the Malibu and seize the firearm in the rear passenger area, Lowe shined a light through the front passenger door and identified a second firearm to Bryson. Although it is not clear, in relation to the start of the search of the Malibu, when Lowe may have identified the second firearm, it was in plain view from where Lowe was standing outside the car. Regardless, the officers possessed ample probable cause to arrest Vincent Legrande. Buchanan can be heard on video discussing the fact that a firearm was in the backseat area with a convicted felon, Legrande, "sitting right on top of it." (Min. Entry 11/07/2019.)

In <u>Thornton v. United States</u>, 541 U.S. 615 (2004), the Court held that "[o]nce an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." <u>Id.</u> at 623. "So

long as an arrestee is the sort of 'recent occupant' of a vehicle such as petitioner was here, officers may search that vehicle incident to the arrest." Id. at 623–24. More recently, in Arizona v. Gant, the Court further explained the authority of law enforcement to search a vehicle, holding that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." 556 U.S. 332, 335 (2009).

In the present case, there is no dispute that the search was appropriate to seize the firearm for which there was probable cause to believe Legrande possessed. Once Lowe identified a second firearm in the front seat of the vehicle, the facts are sufficient to support the search of the vehicle: a firearm had been found in the rear passenger area at the feet of a convicted felon, a tactical weapon was found in the front seat area of the vehicle and, although the passenger was not known to law enforcement, it was reasonable to search further to determine whether Legrande was associated with that weapon, as well as check for any other weapons that might be constructively possessed by Legrande or otherwise unlawfully possessed. This search revealed the two firearms, as well as several grams of heroin.

This court finds, therefore, that because the firearms and the heroin were found pursuant to a lawful search and seizure of the Malibu, the firearms and heroin are admissible and not subject to exclusion. Defendant's motion to suppress is overruled as to these items to the extent it is based on an improper seizure and subsequent search of the Malibu.

The court now turns to the seizure of Defendant.

### B.   Defendant Not Seized When Vehicle Seized

Defendant contends he was seized when officers entered the parking lot, seized the Malibu, and displayed an overwhelming show of force which resulted in Defendant's detention at that time. (See Doc. 11 at 5; Doc. 34 at 5.) The Government argues that Defendant was not detained until he was approached by officers inside the Kangaroo. This court finds Defendant was not seized until he was approached by officers inside the Kangaroo store and physically detained.

The Fourth Amendment protects "against 'unreasonable . . . seizures' [including] seizure of the person." California v. Hodari D., 499 U.S. 621, 624 (1991) (quoting Henry v. United States, 361 U.S. 98, 100 (1959)). A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Police have displayed a show

of authority sufficient to effect a seizure when "a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). A seizure requires either physical force or submission to the assertion of authority. See Hodari D., 499 U.S. at 626–27.

"When submission to police authority is disputed, a court must . . . ascertain whether and when the subject of the seizure actually acquiesced to that authority." United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015). "'[W]ithout actual submission' to the police, 'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection." Id. at 996 (alteration in original) (quoting Brendlin, 551 U.S. at 254). This court finds Stover controls the result here.

There is no dispute that officers displayed an overwhelming force upon seizing the Malibu. As in Stover, in this case "the police officers' aggressive conduct from the start of their interaction with Stover was absolutely an effort [] to try to effect . . . a seizure." Id. at 996–97 (alterations in original) (internal quotation marks omitted). Whether that effort was initially directed solely at Legrande or all of the occupants of the vehicle is not entirely clear, but it would not be unreasonable for all of the occupants of the Malibu to have some concern about the show of force in the parking lot directed at

the Malibu and, quickly thereafter, Legrande. However, even if a reasonable person in Defendant's position would not have felt authorized to leave, Defendant did not submit to that initial show of overwhelming force and authority. "It is well established that a Fourth Amendment seizure requires either the application of physical force or — as relevant here — both an assertion of authority <u>and</u> submission or acquiescence to that show of authority." <u>United States v. Holley</u>, 602 F. App'x 104, 107 (4th Cir. 2015) (citing <u>United States v. Watson</u>, 703 F.3d 684, 689 (4th Cir. 2013)).

As officers seized the Malibu and detained Legrande, Defendant continued to move about inside the Kangaroo and pretend to purchase items while standing at the cash register. As evident from the video, Defendant appeared to be unconcerned about the activity in the parking lot. However, "[a] defendant does not have to remain frozen in order to submit. Nor does he need to bolt from the scene to signal non-submission." <u>Stover</u>, 808 F.3d at 998. "Physical movement alone does not negate the possibility that a seizure may nevertheless have occurred." <u>United States v. Wilson</u>, 953 F.2d 116, 123 (4th Cir. 1991).

Nevertheless, in this case, officers were at most in the process of attempting a seizure of Defendant while the officers were in the parking lot and Defendant was inside the Kangaroo.

The Fourth Amendment does not protect attempted seizures. Brendlin, 551 U.S. at 254; Stover, 808 F.3d at 997. Defendant did not submit to a seizure before officers approached him in the Kangaroo; instead, Defendant acted evasively and in a manner as if to ignore the activity in the lot. In fact, Defendant continued to struggle with officers when he was initially approached inside the Kangaroo. While the indicia of noncompliance is different in this case than that in Stover, here there is no doubt Defendant was attempting to avoid any type of interaction with law enforcement, including a possible seizure, by ignoring their presence and deceptively pretending to be an innocent patron of the Kangaroo.

Because Defendant had not submitted to a seizure before offers approached him in the Kangaroo, Defendant was not seized when the Malibu was seized. At most, the seizure of the Malibu was an attempted seizure of Defendant, and thus the Fourth Amendment does not apply at that point.

C.    **Seizure of Defendant**

1.    **Reasonable Suspicion to Detain**

As noted above, Defendant was not detained at the same time the Malibu was seized; regardless of when he may have been detained, the officers had probable cause to seize the Malibu

and, at minimum, determine who was driving the suspected vehicle.

Nevertheless, Defendant was immediately seized, handcuffed, and searched once officers approached him in the Kangaroo. Defendant contends he was unlawfully detained without individualized suspicion that Defendant had violated the law, citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979). (Doc. 34 at 7.) This court has found Defendant was not a passenger in the car when the car was initially seized and, as a result, was not seized until officers approached him inside the Kangaroo.

Defendant's seizure is somewhat different from a garden-variety traffic stop in which both the passenger and driver are seized while in the car. See Brendlin v. California, 551 U.S. 249 (2007). Even though Brendlin does not directly apply to Defendant here, the traffic-stop situation provides a helpful analogy. "[I]n a traffic-stop setting, the first Terry condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009).

However, the touchstone of the Fourth Amendment is reasonableness. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). This court finds that, having lawfully effected a

seizure of the Malibu on suspicion of fictitious tags, and even though Defendant was out of the car at the time of the stop, he was a recent occupant of the vehicle and it was therefore reasonable for officers to detain him at least until they could investigate and determine who was driving the car and whether fictitious tags were on the vehicle. "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." Johnson, 555 U.S. at 333. This court finds Defendant's detention alone was reasonable, but, as the court details below, the manner in which the officers detained Defendant was problematic.

At the time Defendant was seized by Flowers, officers did not have a reasonable suspicion of any criminal activity by Defendant beyond the possibility of operating a motor vehicle with fictitious tags, nor did the officers have any reasonable belief Defendant might have been armed or dangerous.

In this case, before officers could conduct any inquiry or investigation into the basis for the original seizure of the Malibu – fictitious tags – the investigation escalated into a criminal investigation of Legrande's possession of a firearm.

Just a few seconds after Defendant was seized, circumstances changed significantly. Buchanan entered the store and alerted Flowers and Mayo that a firearm had been found in

the Malibu. Once Buchanan made that announcement, the officers then had probable cause to believe Legrande had committed a criminal offense (possession of a firearm by a convicted felon), as well as their original reasonable suspicion to believe fictitious tags were displayed on the Malibu. The officers therefore also had probable cause to search the vehicle for evidence of Legrande's crimes.

This court thus finds law enforcement had authority, based on at least reasonable suspicion, to justify detaining Staton and Defendant to determine who was driving the Malibu and conclude their search of the Malibu.

Defendant also challenges the marijuana found in his pants pocket, the firearms, the phone, and heroin found in the Malibu, and his statements. The court will address each set of evidence in turn.

### 2. **Marijuana**

To determine whether the marijuana should be suppressed, the court must determine whether the search of Defendant was lawful.

It is a closer question as to whether officers had a reasonable suspicion Defendant was armed and dangerous to permit officers to detain him by the use of handcuffs and conduct what this court views to have been an immediate search of Defendant

by Flowers, which produced marijuana found in Defendant's pants pocket. Regardless, at that point, officers did not have probable cause to search Defendant nor did officers have probable cause to arrest Defendant and conduct a search incident to arrest.

Sergeant Flowers did not testify at the hearing. The body-worn camera video shows, and this court finds, that Defendant was immediately physically detained, initially by Flowers and subsequently by Buchanan. At the point Buchanan arrived inside the Kangaroo to assist in the detention, Buchanan was aware of Legrande and the firearm in the backseat of the vehicle. However, neither Flowers nor Buchanan had any suspicion other than a possible fictitious tag violation as to the driver and/or owner of the vehicle. Neither Buchanan nor any other officer has offered any facts to support a finding Defendant may have been armed and dangerous except for the fact he was in the car with a convicted felon who possessed a firearm. This court is not aware of any authority to support a finding that Defendant's presence in the company of a convicted felon, albeit an armed one, is sufficient to suggest Defendant presented a danger, nor has law enforcement offered any objective facts to explain why this may have been the case.

Regardless of whether the application of handcuffs constituted a <u>Terry</u>-type detention or an arrest, no justification for law enforcement's actions has been offered to sustain the officer's actions at that moment. Nor has any evidence been presented to support a search of Defendant at that time.[8]

The exclusionary rule bars "from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963). Here, the marijuana found on Defendant at the time of the search by Flowers is the result of an unlawful search and is subject to suppression.

---

[8] The Government concedes this court does not have evidence to support a finding of inevitable discovery. (<u>See</u> Doc. 33 at 21-22.) This court is not persuaded the inevitable discovery doctrine would not apply; the officers had both a traffic violation, the odor of marijuana, and probable cause to believe a felon was in possession of a firearm, all of which might reasonably allow an extension of a traffic stop to determine who was driving the car and complete the search authorized by probable cause. The evidence is clear that by the time the search and investigation were reasonably concluded, a firearm had been found in the front seat of the car along with heroin in the console, both of which were evidence subsequently used to support an arrest of Defendant. Nevertheless, given the evidence that officers used overwhelming force to physically detain Defendant in handcuffs and subsequently search his pockets, perhaps without regard to applicable constitutional requirements, this court declines to find a justification for that conduct in the absence of some explanation from the officer to justify his conduct.

### 3. <u>Independent Source Doctrine</u>

Unlike the marijuana, however, the telephone, the heroin, and the two firearms were not seized as the result of a search of Defendant; they were seized through a source completely independent of any act by law enforcement of placing Defendant in handcuffs and searching his person.

The independent source doctrine permits the introduction of evidence "acquired in a fashion untainted by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts x and y, but fact z has been learned by other means, fact z can be said to be admissible because derived from an 'independent source.'" <u>Murray v. United States</u>, 487 U.S. 533, 537–38 (1988). In this case, the marijuana was discovered by an unlawful search, but the items found and seized during the search of the Malibu were discovered by other means, completely independent of any wrongdoing in the detention and search of Defendant. "[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." <u>Utah v. Strieff</u>, 579 U.S. ____, ____, 136 S. Ct. 2056, 2061 (2016).

The independent source must be "wholly independent," <u>Nix v. Williams</u>, 467 U.S. 431, 432 (1984), and there is no doubt the

search of the Malibu was wholly independent of any unlawful
handcuffing and search of Defendant. There is no doubt the two
firearms and the heroin were seized solely as a result of the
search of the Malibu. Defendant argues his cell phone was in the
car and seized, and that cell phone was seized from an area in
the car within which Defendant had a reasonable expectation of
privacy. This court disagrees, see supra Part II.A.3, and finds
that the cell phone was seized as a result of the search of the
Malibu and its seizure was independent of any detention of
Defendant.

This court concludes the search of the Malibu and the
seizure of the firearms, telephone, and heroin were independent
of any unconstitutional action in handcuffing and searching
Defendant and thus are free from any potential taint of such
actions.

### 4.   Defendant's Statements

Defendant was arrested that night for firearm and narcotic
charges. The narcotics charge was for the heroin. Defendant was
transported to the jail for processing. After Buchanan provided
a weight of the heroin to the Magistrate at the jail, Defendant
asked Buchanan what weight he gave to the Magistrate. When
Buchanan mentioned the weight, Defendant responded that was
incorrect. Defendant does not raise a challenge to his arrest

separate and apart from the seizures and searches that occurred at the Kangaroo, nor does Defendant directly challenge the statement other than to contend it is the fruit of the poisonous tree as a result of the unconstitutional seizure and search of the Malibu and the unconstitutional seizure of Defendant. Because this court finds no constitutional violation as to the seizure and search of the Malibu or the detention of Defendant as a result of items found in the Malibu, this court finds Defendant's statement, to the extent it is otherwise admissible and relevant, admissible at trial.

Because Defendant was arrested for the heroin and firearms, Defendant's subsequent statements were the result of independent sources, not due to any unconstitutional detainment by the police before the officers knew of the heroin and firearms, and therefore, Defendant's statements are admissible and not subject to suppression.

**IT IS THEREFORE ORDERED** that for the reasons set forth herein, Defendant's Motion to Suppress, (Doc. 11), is **GRANTED IN PART** and the marijuana seized from Defendant is **SUPPRESSED,** and **DENIED** as to the firearms, the cell phone, and heroin found in the vehicle and the statements Defendant made at the time of his arrest.

This the 12th day of December, 2019.

William L. Osteen, Jr.

United States District Judge
